**The STATE of Ohio, Appellee,**

v.

**WOLF, Appellant.**

[Cite as *State v. Wolf,* 176 Ohio App.3d 165, 2008-Ohio-1483.]

Court of Appeals of Ohio,
Third District, Union County.

No. 14–06–54.

Decided March 31, 2008.

Eric J. Allen, for appellant.

David W. Phillips, Union County Prosecuting Attorney, and Terry L. Hord, Assistant Prosecuting Attorney, for appellee.

---

ROGERS, Judge.

{¶ 1} Defendant-appellant, Harold Wolf, appeals the judgment of the Union County Court of Common Pleas convicting him of aggravated arson and sentencing him to consecutive, nonminimum prison terms. On appeal, Wolf contends that his aggravated-arson conviction was against the manifest weight of the evidence and was not supported by sufficient evidence, that he was denied effective assistance of counsel, and that the trial court erred in imposing consecutive, nonminimum sentences. Based upon the following, we reverse the judgment of the trial court.

{¶ 2} In June 2006, Wolf was indicted for one count of aggravated arson in violation of R.C. 2909.02(A)(1), a felony of the first degree; one count of arson in violation of R.C. 2909.03(A)(2), a felony of the fourth degree; one count of attempted grand theft in violation of R.C. 2923.02 and 2913.02(A)(3), a felony of the fifth degree; one count of possessing criminal tools in violation of R.C. 2923.24(A),(C), a felony of the fifth degree; and one count of insurance fraud in violation of R.C. 2913.47(A)(1), a felony of the fourth degree. The indictment arose from an incident whereby Wolf poured gasoline throughout his mobile home, set fire to it, was injured by an explosion prior to the arrival of any firefighters, and then attempted to collect insurance proceeds from State Farm Mutual Insurance Company.

{¶ 3} In July 2006, Wolf entered a plea of not guilty as to all counts in the indictment.

{¶ 4} In October 2006, the case proceeded to jury trial, during which the following testimony was heard.

{¶ 5} Raymond Estep testified that on October 9, 2005, he resided in a mobile home in the Marysville Estates near Wolf's mobile home; that around 10:45 p.m., he was watching television when he heard a "rumble" and a "whoosh" noise; that he walked outside to see what the noise was; that he saw a glow coming out of Wolf's garage, saw the shadows of flames, and noticed that the garage door was deformed and pushed out at a 45–degree angle; that he told his wife to call 9–1–1, which she did; that he walked up Wolf's driveway and saw burning paper in the garage; that Wolf then came around the side of the garage and "was flailing at trying to get his jacket off"; and that smoke was coming off of Wolf and he said "I'm burnt up."

{¶ 6} Nathan Weirich testified that he has been a firefighter for the Marysville Fire Department for 14 years; that he had attended a "200 hour school" as firefighter training, which taught him "the basics of all aspects of the fire service"; that on October 9, 2005, he was dispatched to a fire at 277 Magnolia Drive in Marysville; that two fire engines and seven firefighters responded to the fire; that he observed that the mobile home's attached garage door was bent outward; that after gaining entrance to the mobile home, the firefighters extinguished a fire in the kitchen; that no one besides the firefighters was present inside the mobile home; that he observed "pour patterns" located on the floor throughout the mobile home; that pour patterns are burnt marks that look like puddles that result from ignitable liquids, such as gasoline, being poured out of containers; that he located a gas can inside the mobile home; and that when gasoline is poured throughout a structure, it creates a hazard for firefighters because the vapors can permeate their clothing and ignite when exposed to heat or fire.

{¶ 7} On cross-examination, Weirich testified that the fire was not a particularly difficult fire to extinguish; that although there was smoke in the mobile home, "there was very little fire"; that the firefighters extinguished the fire within one minute; that none of the firefighters suffered any injuries as a result of the fire; and that the fire was not accompanied by unusually high temperatures.

{¶ 8} Lieutenant Keith Watson, fire prevention lieutenant for the Marysville Fire Department, testified that "the first thing that you notice when you went inside the residence was the overwhelming smell of what appeared to be gasoline"; that the garage door was blown outward due to an explosion inside the mobile home; that when gasoline concentration in the air becomes too high, the air will not support combustion and, accordingly, the fire will then go out; and that gasoline fires present a hazard to firefighters because the gasoline makes the fire very unpredictable.

{¶ 9} Steve Southard, fire and explosion investigator for the State Fire Marshall's Office, testified that he investigated the fire at 277 Magnolia Drive; that a very pungent odor of gasoline was prevalent throughout the mobile home; that he observed "ignitable liquid pour patterns on the floor along the couch, on the east wall, and in front of the entertainment system on the west wall"; that the ignitable-liquid pour patterns and lack of accidental ignition source indicate that the fire was intentionally set; and that the fire "was obviously easy to put out." Further, Southard testified that fires may be accompanied by high-order explosions, which cause devastation, or low-order explosions, which cause a shockwave. Southard surmised that a shockwave explosion had occurred in Wolf's mobile home, explaining:

{¶ 10} "The vapors of gasoline inside were very, very high. In our scientific data, gasoline will ignite with 1.4 percent vapors up to 7.6 percent vapors or percentages of vapor in a room. With the amount of gasoline and the liquid surface area, the vapors inside the structure were much greater than 7.6 percent, so the higher explosive limits of gasoline would not ignite with the small fire that was inside. There is no oxygen.

{¶ 11} "The vapors displace the oxygen inside the room. The vapors are very, very high, very present. When that garage door was opened, it allowed a column of fresh oxygen into the room at the ignition source or origin of the fire, and the rapid development of fire, which we call a deflagration, created a big plume or shockwave, and it traveled in the direction the oxygen was being received.

{¶ 12} "So when the door opened, the fire blew out that garage door. The fire then—the pressure in the fire traveled out the garage door, and then the pressure inside the mobile home became so great that it slammed the door shut, and then that increased additional pressure out in the garage, which the direction of the shockwave was right toward the garage door. That's what caused the garage door to blow out."

{¶ 13} Additionally, when questioned what the result of a high-pressure explosion, as opposed to a low-pressure explosion, would have been, Southard testified:

{¶ 14} "Well, to give you an example of what maybe happened in this situation, if the door from the garage door was open fully and remained open, that large column of oxygen would have mixed within [sic] all that gasoline through the entire structure. We may have had a deflagration or explosion that would have leveled the entire structure because of the vapors inside. That didn't occur."

{¶ 15} Dr. Peter Hoy of Memorial Hospital in Marysville testified that he treated Wolf on October 9, 2005; that Wolf's beard and eyelashes were "somewhat singed"; that he had a second degree burn on his leg and on his wrist; that he had a first degree burn on his face; and that Wolf had no other injuries. Additionally, Dr. Hoy authenticated an emergency room report concerning Wolf's treatment.

{¶ 16} James Smith, a firefighter paramedic of the Allen Township Fire Department in Marysville, testified that on October 9, 2005, he observed that Wolf had a second degree burn on his wrist, a first and second degree burn on his leg, and singed hair.

{¶ 17} At the close of the state's evidence, Wolf moved for a judgment of acquittal pursuant to Crim.R. 29 on the possessing-criminal-tools count and the aggravated-arson count. The trial court sustained the motion as to the criminal-tools count, but overruled the motion as to the aggravated-arson count.

{¶ 18} Thereafter, the jury convicted Wolf of aggravated arson, arson, attempted grand theft, and insurance fraud. The trial court sentenced Wolf to a six-year prison term on the aggravated-arson conviction and 12–month prison term on the arson conviction, to be served consecutively. Additionally, the trial court sentenced Wolf to a six-month prison term on the attempted-grand-theft conviction and a six-month prison term on the insurance-fraud conviction, to be served concurrently to each other and to the aggravated-arson and arson sentences. Further, the trial court ordered Wolf to pay $3,333.11 in restitution to the Marysville Fire Department, $284.36 in restitution to the Allen Township Fire Department, and $17,278.94 in restitution to State Farm Mutual Insurance Company.

{¶ 19} It is from this judgment that Wolf appeals, presenting the following assignments of error for our review.

### Assignment of Error No. I

"The conviction for aggravated arson is against the manifest weight of the evidence."

### Assignment of Error No. II

"The conviction for aggravated arson was not supported by sufficient evidence."

### Assignment of Error No. III

"The appellant was denied effective assistance of counsel in violation of the Sixth Amendment to the federal Constitution and Article One, Section Ten of the Ohio Constitution."

### Assignment of Error No. IV

"The trial court erred when it sentenced the appellant to consecutive sentences."

### Assignment of Error No. V

"The trial court erred when it imposed more than the minimum sentence in this matter for the offense of aggravated arson."

{¶ 20} Due to the nature of Wolf's assignments of error, we elect to address them out of order and to address his fourth and fifth assignments of error together.

*Assignment of Error No. II*

{¶ 21} In his second assignment of error, Wolf argues that his aggravated-arson conviction was not supported by sufficient evidence. Specifically, Wolf argues that the state failed to prove beyond a reasonable doubt that he knowingly created a substantial risk of serious physical harm to anyone other than himself. We agree.

{¶ 22} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, citing *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668. Sufficiency is a test of adequacy, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148, superseded by state constitutional amendment on other grounds as stated in *Smith*, supra.

{¶ 23} Wolf was convicted of aggravated arson under R.C. 2909.02, which provides:

"(A) No person, by means of fire or explosion, shall knowingly do any of the following:

"(1) Create a substantial risk of serious physical harm to any person other than the offender."

{¶ 24} In interpreting R.C. 2909.02, a "person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Additionally, a "substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). The Ohio Jury Instructions emphasize the distinction between a "strong possibility," "remote possibility," and "significant possibility" by suggesting the option of adding the words "even a" in front of the phrase "significant possibility." See 4 Ohio Jury Instructions (2003), Section 509.02(3). " '[T]he language chosen by the General Assembly contemplates three degrees of 'possibility': the highest is 'strong,' the middle is 'significant,' and the lowest is 'remote.' For this reason, the Committee added '(even a)' to the statutory definition.' " *State v. Eggeman*, 3d Dist. No. 15–04–07, 2004-Ohio-6495, 2004 WL 2785951, ¶ 40 (Rogers, J., concurring in part and

dissenting in part), quoting 4 Ohio Jury Instructions (2003), Section 509.02(3), at comment. Accordingly, the statutory definition of substantial risk recommended by the Ohio Jury Instructions reads: " 'a strong possibility as contrasted with a remote or even a significant possibility, that a certain result may occur or that certain circumstances may exist.' " Id.

{¶ 25} R.C. 2901.01(A)(5) explains that "serious physical harm to persons" includes:

"(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

"(b) Any physical harm that carries a substantial risk of death;

"(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

"(d)Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

"(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 26} Finally, in examining aggravated arson, this court has found that:

"The 'knowingly' element in an aggravated arson case refers to a defendant's state of mind when he set a fire—i.e. the defendant is aware that the fire or explosion he set will probably create a substantial risk of serious physical harm. The requisite proof is not dependant upon the actual result of the fire but is based upon the risk of harm created by the defendant's actions." *Eggeman,* 2004-Ohio-6495, 2004 WL 2785951, at ¶ 14.

{¶ 27} Here, we find that there was insufficient evidence that Wolf knowingly created a substantial risk of serious physical harm to anyone other than himself. Testimony was presented that gasoline vapors can permeate firefighters' clothing and ignite when exposed to heat or fire causing serious physical harm; however, no testimony was presented that there was a strong possibility of this occurring during this particular fire. In fact, no testimony was presented that there was even a significant possibility of this occurring, and testimony was heard that the fire was small, was extinguished within one minute, and was not accompanied by unusually high temperatures. Additionally, although extensive testimony was heard regarding the cause of the first explosion, which injured Wolf, no testimony was heard that there was a strong possibility of a second explosion or what serious physical harm the firefighters may have suffered as a result of another explosion. Further, although testimony was heard regarding the conditions required for an explosion, we cannot discern from the testimony whether these conditions were still present when firefighters were likely to have entered the

mobile home. Accordingly, reviewing the evidence presented in a light most favorable to the prosecution, we cannot conclude that any rational trier of fact could be convinced beyond a reasonable doubt that Wolf knowingly created a substantial risk of serious physical harm to anyone other than himself.

{¶ 28} Accordingly, we sustain Wolf's second assignment of error.

### *Assignment of Error No. III*

{¶ 29} In his third assignment of error, Wolf argues that his constitutional rights were violated because he was denied effective assistance of counsel. Specifically, Wolf contends that trial counsel was ineffective because trial counsel filed a motion, not ex parte, requesting that an expert witness be provided due to indigence, which he contends informed the state that its own expert would be unchallenged; because trial counsel did not hire and call an arson expert; because trial counsel did not object to firefighters being permitted to testify as experts without the proper foundation being laid; and because trial counsel did not object to Dr. Hoy's testimony.

{¶ 30} An ineffective-assistance-of-counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. To show that he has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. Id. at paragraph three of the syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy* (1992), 63 Ohio St.3d 424, 433, 588 N.E.2d 819, superseded by constitutional amendment on other grounds as recognized by *State v. Smith,* 80 Ohio St.3d at 103, 684 N.E.2d 668.

{¶ 31} Furthermore, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Richardson,* 3d Dist. No. 13–06–21, 2007-Ohio-115, 2007 WL 92367, citing *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407, 717 N.E.2d 1149. Tactical or strategic decisions, even if unsuccessful, generally do not constitute ineffective assistance. *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965. Additionally, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Fritz,* 3d Dist. No. 13–06–39, 2007-Ohio-3138, ¶ 35, citing *State v. Malone* (Dec. 13, 1989), 2d Dist. No. 10564, 1989 WL 150798.

■ {¶ 32} Wolf's first and second arguments contend that trial counsel was ineffective for filing a motion not ex parte, requesting an expert witness and for failing to hire or call an arson expert. However, nothing in the record indicates that any arson experts would have presented testimony materially different from that presented by the state's arson expert. Additionally, trial counsel thoroughly cross-examined the state's arson expert. Therefore, Wolf has not demonstrated a reasonable probability that, but for trial counsel filing the motion or failing to hire an arson expert, the outcome of his trial would have been different. See *State v. Young* (Feb. 1, 2002), 3d Dist. No. 4–01–18, 2002 WL 129824; *State v. Thompson* (1987), 33 Ohio St.3d 1, 10–11, 514 N.E.2d 407.

■ {¶ 33} Wolf's third argument is that he was denied effective assistance because trial counsel did not object to firefighters being permitted to testify as experts without a proper foundation being laid. Specifically, Wolf complains that Weirich testified without objection as to the hazards of gasoline being poured into a home and that other firefighters testified without objection as to the meaning of burn patterns. However, Weirich testified extensively as to his experience and the training he received to be a firefighter. We find that Weirich's testimony laid the necessary foundation for the admissibility of the evidence. See Evid.R. 702. Moreover, regarding Weirich's testimony on burn patterns, Southard, the fire and explosion investigator, also testified about burn patterns. Thus, even if a necessary foundation was not laid, Weirich's testimony was cumulative. See *State v. Trouten*, 7th Dist. No. 04–JE–18, 2005-Ohio-6592, 2005 WL 3370590, ¶ 190–191. Accordingly, Wolf failed to demonstrate a reasonable probability that, but for trial counsel's failure to object, the outcome of his trial would have been different.

■ {¶ 34} Wolf's fourth argument is that trial counsel was ineffective for failing to object to Dr. Hoy's testimony about Wolf's injuries and authentication of hospital reports introduced by the state, which enabled the state to corroborate Southard's testimony that an explosion had occurred in Wolf's mobile home. However, Smith, the paramedic, also testified about the location and extent of Wolf's injuries, making Dr. Hoy's testimony cumulative. See *Trouten*, supra. Consequently, Wolf failed to demonstrate a reasonable probability that, but for trial counsel's failure to object to Dr. Hoy's testimony, the outcome of his trial would have been different.

{¶ 35} Accordingly, we overrule Wolf's third assignment of error.

### *Assignment of Error No. I*

{¶ 36} In his first assignment of error, Wolf contends that his conviction for aggravated arson is against the manifest weight of the evidence. Our disposition

of Wolf's second assignment of error renders his first assignment of error moot, and we decline to address it. App.R. 12(A)(1)(c).

*Assignments of Error Nos. IV & V*

{¶ 37} In his fourth and fifth assignments of error, Wolf contends that the trial court erred in sentencing him to consecutive prison terms and to a nonminimum prison term on the aggravated-arson conviction. Due to our reversal of Wolf's aggravated-arson conviction in his second assignment of error, Wolf no longer has consecutive prison terms because his remaining prison terms were all concurrent. Additionally, Wolf has only disputed the nonminimum prison term imposed on his aggravated arson conviction. Accordingly, our disposition of Wolf's second assignment of error renders his fourth and fifth assignments of error moot, and we decline to address them. App.R. 12(A)(1)(c).

{¶ 38} Finally, while not raised by Wolf as an assignment of error, we note that the trial court ordered Wolf to pay $3,333.11 in restitution to the Marysville Fire Department and $284.36 in restitution to the Allen Township Fire Department. Generally, an appellant waives an error by failing to object or bring the error to the court's attention. Crim.R. 52(B). A reviewing court will not examine such an error unless it constitutes plain error. Id. Under plain-error analysis, the court determines whether there is an error, whether it is plain error, and whether the defendant was prejudiced by the error. *United States v. Olano* (1993), 507 U.S. 725, 733–734, 113 S.Ct. 1770, 123 L.Ed.2d 508. The court determines prejudice by ascertaining whether the error created a manifest injustice or seriously affected the "fairness, integrity or public reputation of [the] judicial proceedings." Id.; *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 39} R.C. 2929.18(A)(1) governs imposition of financial sanctions and provides that a trial court may impose:

"(1) *Restitution by the offender to the victim of the offender's crime or any survivor of the victim, in an amount based on the victim's economic loss.* * * * If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, *provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense.*" (Emphasis added.)

{¶ 40} In examining the statute, this court has found that, based upon the plain language of R.C. 2929.18(A)(1), the General Assembly intended that

restitution be available only to the actual victims of the offense. *State v. Toler*, 174 Ohio App.3d 335, 2007-Ohio-6967, 882 N.E.2d 28, ¶ 11; *State v. Christy*, 3d Dist. No. 16–04–04, 2004-Ohio-6963, 2004 WL 2940888, ¶ 16, citing *State v. Samuels*, 4th Dist. No. 03CA8, 2003-Ohio-6106, 2003 WL 22704409, ¶ 5. "Accordingly, 'the right to order restitution is limited to the actual damage or loss caused by the offense of which the defendant is convicted.' " *Toler*, 174 Ohio App.3d 335, 2007-Ohio-6967, 882 N.E.2d 28, at ¶ 11, quoting *State v. Williams* (1986), 34 Ohio App.3d 33, 34, 516 N.E.2d 1270. Consequently, "[w]ith the exceptions of certain circumstances inapplicable to this case, government entities do not constitute 'victims' entitled to restitution for their expenditure of public funds in the pursuit of fighting crime." Id., citing *State v. Pietrangelo*, 2005-Ohio-1686, 2005 WL 820526, at ¶ 15–17; see also *Samuels*, 2003-Ohio-6106, 2003 WL 22704409, at ¶ 5 (providing examples of when a government entity is a victim entitled to restitution).

{¶ 41} Here, the record is unclear whether the restitution ordered to the Marysville Fire Department and Allen Township Fire Department was imposed in conjunction with Wolf's arson or aggravated-arson conviction. Therefore, although we reverse Wolf's aggravated-arson conviction, we must address the issue of restitution because his arson conviction remains. As this court made clear in *Toler*, a trial court may only order a defendant to pay restitution for economic losses suffered by the victim that may have stemmed directly from the offense. The fire departments were not victims of the arson. Accordingly, we find that the trial court erred in ordering Wolf to pay the fire departments restitution.[1]

{¶ 42} Having found error prejudicial to the appellant herein, in the particulars assigned and argued in his second assignment of error, and in the matter of restitution, we reverse the judgment of the trial court and remand the matter for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

WILLAMOWSKI, J., concurs.

PRESTON, J., concurs in part and dissents in part.

---

1. We note that the trial court also ordered Wolf to pay restitution to State Farm Mutual Insurance Company restitution. However, unlike the fire departments, the insurance company was a victim of the insurance fraud offense, and, thus, was entitled to restitution.

PRESTON, Judge, concurs in part and dissents in part.

{¶ 43} I concur with the majority regarding the third assignment of error and the finding that the trial court erred in ordering Wolf to pay restitution to the fire departments. However, since I would find that there was sufficient evidence for a jury to find Wolf guilty of aggravated arson pursuant to R.C. 2909.02(A)(1), I must respectfully dissent in part from the majority opinion. Moreover, since I would find that there was sufficient evidence to convict Wolf of aggravated arson, I would find that the first, fourth, and fifth assignments of error are not moot and would address them.

{¶ 44} When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 45} Wolf was convicted of aggravated arson under R.C. 2909.02, which provides:

"(A) No person, by means of fire or explosion, shall knowingly do any of the following:

"(1) Create a *substantial risk of serious physical harm to any person other than the offender.*" (Emphasis added.)

Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." The Revised Code also defines a "substantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶ 46} This court has previously examined R.C. 2909.02, the aggravated-arson statute, and has stated:

"In order to prove an aggravated arson case, the State must prove beyond a reasonable doubt that the defendant, by means of fire or explosion, *knowingly* created a *substantial risk of serious physical harm.* R.C. 2909.02(A)(1). The 'knowingly' element in an aggravated arson case refers to a defendant's state of mind when he set a fire—i.e. the defendant is aware that the fire or explosion he set will probably create a substantial risk of serious physical harm. The requisite proof is not dependent upon the actual result of the fire but is based upon the risk of harm created by the defendant's actions." *State v. Eggeman,* 3d Dist. No. 15–04–07, 2004-Ohio-6495, 2004 WL 2785951, ¶ 14 (Rogers, J.

dissented in part and concurred in part arguing that the State failed to prove beyond a reasonable doubt all of the elements of aggravated arson).

{¶ 47} During the trial, the prosecution presented the testimony of Nathan Weirich, Lieutenant Keith Watson, and Steve Southard. Weirich testified that two fire engines and a total of seven firefighters responded to the fire; that there was a gas can located in the residence that still had fuel within it; and that there were pour patterns located in the residence, which indicated that an accelerant was used. Further, Weirich testified:

"Q. And can you tell the jury please, when you go to a typical house fire, would you expect to find a large quantity of gasoline inside that structure?

"A. No, sir.

"Q. Sir, in your experience and based upon your training, does the presence of that gasoline poured throughout the structure create a hazard to you and your firefighters?

"A. Most definitely.

"Q. Can you tell the jury please what the hazard is?

"A. The vapors off of—if it's—all depending on what the ignitable liquid is. Whether it's gasoline, kerosene, whatnot, the vapors itself can actually get into your clothing. And therefore, whenever the induction of oxygen or a heat source, fire, it can actually ignite that and your clothes can actually catch on fire also.

"Q. Sir, would that presence be an unusual risk as far as responding to a fire such as this?

"A. Yes.

"Q. Create a risk—if that flame were to get into your clothing and ignite, would that create a risk of harm to you? Would that cause you harm?

"A. Most definitely.

"Q. Sir, could it go so far as to cause, based again, based on your training and experience, cause you or another firefighter to suffer the peril of death?

"A. Yes."

{¶ 48} Lieutenant Watson testified that he arrived at Wolf's residence and that "the first thing that you notice[d] when you went inside the residence was the overwhelming smell of what appeared to be gasoline." According to Lieutenant Watson, gasoline presents a hazard to firefighters "because it makes the fire very unpredictable." In regards to gasoline vapors, Lieutenant Watson testified:

"Q. What happens, sir, when there's too much gasoline where the concentration is too high?

"A.   The gasoline vapors become too rich.   They dispose the oxygen.   It will not support combustion.

"Q.   What do we need for combustion then?   We need?

"A.   Approximately 1.5 to 7.6 percent.

"Q.   Of?

"A.   Of gasoline vapors in the air is the flammable range.

"Q.   Sir, is it a fair analogy when your—like when your car is flooded, there's too much goes [sic], not enough oxygen?

"A.   That's correct.

"Q.   At that point then, what happens with the fire?

"A.   It will go out."

{¶ 49} Steve Southard, a fire and explosion investigator employed at the State Fire Marshall's Office, testified that in fighting and determining a fire there are three elements you look for:  fuel load, ambient oxygen in the air, and a heat source or ignition source.   Southard testified that he saw "ignitible liquid pour patterns on the floor along the couch, on the east wall, and in front of the entertainment system on the west wall."   Further, Southard testified that there was "ignitable liquid poured throughout the structure to cause serious damage to the structure."   Southard testified to the meaning of the burn patterns, that there was a prevalent smell of gasoline, and that the fire was intentionally set.

{¶ 50} Southard examined the structure and found that the "garage door had evidence of what appeared to be like a shockwave damage from inside to outside.* * *   It blew out away from the structure.   The whole left side of the door was ajar, so I knew at that point that there was an explosion involved in this."   Southard examined the structure and determined that there were two points of origin and that the origin of the explosion was at the garage door inside the structure.

{¶ 51} In regards to the gasoline vapors, Southard testified:

"A.   The vapors of gasoline inside were very, very high.   In our scientific data, gasoline will ignite with 1.4 percent vapors up to 7.6 percent vapors or percentages of vapor in a room.   With the amount of gasoline and the liquid surface area, the vapors inside the structure were much greater than 7.6 percent, so the higher explosive limits of gasoline would not ignite with the small fire that was inside.   There is no oxygen.

"The vapors displace the oxygen inside the room.   The vapors are very, very high, very present.   When that garage door was opened, it allowed a column of fresh oxygen into the room at the ignition source or origin of the fire, and the rapid development of fire, which we call a deflagration, created a big plume or shockwave, and it traveled in the direction the oxygen was being received.

"So when the door opened, the fire blew out that garage door. The fire then—the pressure in the fire traveled out the garage door, and then the pressure inside the mobile home became so great that it slammed the door shut, and then that increased additional pressure out in the garage, which the direction of the shockwave was right toward the garage door. That's what caused the garage door to blow out." Southard testified that "[w]hen the vapor and oxygen mix with an ignition source, there was an explosion."

{¶ 52} Southard testified:

"Q. Sir, you talked about the idea of a low pressure explosion and a high pressure explosion. Mr. Heckman asked you about the degree of force. A high pressure explosion, what's the result of that?

"A. Well, to give you an example of what maybe happened in this situation, if the door from the garage door was open fully and remained open, that large column of oxygen would have mixed within all that gasoline through the entire structure. We may have had a deflagration or explosion that would have leveled that entire structure because of the vapors inside. That didn't occur."

On cross-examination, Southard stated that the fire was "obviously easy to put out."

{¶ 53} Although Southard testified that the fire was "obviously easy to put out," whether there was a substantial risk of serious physical harm does not depend upon the actual results of the fire. *Eggeman*, 2004-Ohio-6495, 2004 WL 2785951, at ¶ 14. Instead, the issue is whether Wolf was "aware that the fire or explosion he set will probably create a substantial risk of serious physical harm." The evidence clearly indicates that Wolf saturated his trailer with gasoline throughout the trailer and set it on fire. The trailer was located in a mobile-home park, which contained several other mobile homes. Given that the fire was set in a trailer located in a mobile home park with other mobile homes nearby, the fire in the trailer was likely to be reported and firefighters dispatched to the scene quickly. A reasonable jury could infer that when Wolf poured gasoline throughout his trailer and set it on fire, he knowingly created a strong possibility of a risk of serious physical harm to others, including firefighters responding to the fire and individuals living in the mobile-home park.

{¶ 54} Therefore, after reviewing the record, in a light most favorable to the prosecution, I would find that there was sufficient evidence for a rational jury to find Wolf guilty of aggravated arson under R.C. 2909.02. Moreover, since I would overrule Wolf's second assignment of error, I would have found that the first, fourth, and fifth assignments of error are not moot. Consequently, I must dissent in part from the majority's opinion.