[Cite as *State v. Pfeiffer*, 2015-Ohio-4312.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,                                              CASE NO. 13-15-22

    PLAINTIFF-APPELLEE,

    v.

JARROD R. PFEIFFER,                                  O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Seneca County Common Pleas Court

Trial Court No. 14 CR 0243

Judgment Affirmed in Part, Reversed in Part and Remanded

Date of Decision:  October 19, 2015


APPEARANCES:

    *John M. Kahler II* for Appellant

    *Brian O. Boos* for Appellee

**ROGERS, P.J.,**

{¶1} Defendant-Appellant, Jarrod Pfeiffer, appeals the judgment of the Court of Common Pleas of Seneca County convicting him of two counts of aggravated arson and sentencing him to three years in prison. On appeal, Pfeiffer argues that the trial court erred by entering a verdict that was not supported by sufficient evidence. Further, Pfeiffer argues that the trial court erred by entering a verdict that was against the manifest weight of the evidence. For the reasons that follow, we affirm in part, reverse in part, and remand the trial court's judgment.

{¶2} On October 8, 2014, the Seneca County Grand Jury returned a two count indictment against Pfeiffer charging him with one count of aggravated arson in violation of R.C. 2909.02(A)(1), (B)(2), a felony of the first degree; and one count of aggravated arson in violation of R.C. 2909.02(A)(2), (B)(3), a felony of the second degree. Pfeiffer entered a written plea of not guilty on October 10, 2014.

{¶3} The matter proceeded to a jury trial held on March 12, March 13, and March 16, 2015. Sergeant Jared Watson of the Tiffin Police Department was the first witness to testify on behalf of the State. Sergeant Watson testified that he was working on September 5, 2014 and responded to a fire call at the local Walmart. Upon arrival, Sergeant Watson stated that he could see smoke permeating from the building. He added that the fire department arrived soon after he did.

{¶4} Sergeant Watson testified that the fire department informed him that the fire appeared to be suspicious, so he contacted Detective Lieutenant Marquis and explained the situation. Next, Sergeant Watson stated that he met with Paul Crawford, a Walmart employee tasked with the responsibility of loss-prevention, to review surveillance video in an attempt to determine if any suspects existed. Sergeant Watson was asked to describe the interior of the store and provided the following answer: "When I went inside the building, I could see water on the floor and the smoke was getting heavier than it was when I initially pulled up in front of the store. There was a very acrid burning smell as if there had just been a fire inside the store." Mar. 12, 2015 Trial Tr., p. 158. He also testified that Lieutenant Marquis asked him to find a person of interest spotted in the video, a Walmart employee who was later identified as Pfeiffer, and transport the person to the police station to be interviewed.

{¶5} On cross-examination, Sergeant Watson admitted that the fire was extinguished by the time he arrived. He also stated that the fire was contained to a single display in the sporting goods department.

{¶6} Deputy Fire Chief Kevin Veletean of the Tiffin City Fire Division was the next witness to testify. Deputy Veletean testified that he investigated fires in the city as part of his duties. Deputy Veletean stated that he was called in to investigate a fire at the local Walmart on September 5, 2014. He testified that the building was occupied at the time of the fire.

{¶7} Deputy Veletean explained that he ultimately determined that the fire started in an "action alley" of the store near the sporting goods department. *Id.* at p. 167-168. He stated that "action alley" is a term used by Walmart employees that refers to a long corridor or one of the main walking aisles in the store. Deputy Veletean was asked to identify several photographs that he took of the damage caused by the fire. The photographs were later admitted into evidence.

{¶8} Deputy Veletean testified that a display near the fire had "muzzle-loader supplies that had a number of 1-pound cans of black powder. There was also pre-made Pyrodex black powder pallets. There was also boxes of ammunition, 1-pound propane cylinders, and a number of cases of aerosol bug repellants." *Id.* at p. 171-172.

{¶9} Through a process of elimination and other scientific methods, Deputy Veletean explained that he was able to determine that the fire originated from the lower left-hand side of the display and that the fire was caused by a person. He added that he prepared a report in conjunction with his investigation, which he identified, and it was later admitted into evidence.

{¶10} When asked to describe what damage, if any, the fire caused, Deputy Veletean replied,

> The immediate area where the merchandise aisle or the island was, it sustained damage. Also, the products around it sustained damage. The display cases around it also had damage. And then the building had significant soot and smoke damage throughout it, as well, and water damage from the activation of the sprinkler system.

*Id.* at p. 175.

{¶11} Then the following exchange occurred.

Q: What sort of safety risks are inherent when a fire like this occurs?

A: There's a number of them: the fire itself causing burns, the smoke-inhalation risk. This fire was more so interesting in causing a risk because of the items I mentioned earlier being in such close proximity: the cans of black powder, the aerosol cans, the propane cylinders, the propane, the small camping propane cylinders and ignition.

In addition to that, the smoke. Once the sprinkler system activated, that cooled the environment, which ended up causing the smoke to spread throughout the building quicker. Individuals that could have been on the grocery side or away from the actual fire itself would have been exposed quicker to the smoke at that point rather than hot smoke rising up out of the building.

Q: So smoke caused by the fire could have caused problems for persons that were inside the building clear on the other side of Walmart?

A: Yes, absolutely.

*Id.* at p. 176.

{¶12} Deputy Veletean explained that the aerosol cans posed a significant risk of injury because the contents were extremely flammable. Thus, the contents could have either burst into flames or caused the can to project itself throughout the store like a missile. Additionally, Deputy Veletean stated that all the black

powder required to explode was a flame. He added that all these flammable materials were located within a five foot proximity of the fire.

{¶13} Deputy Veletean testified that he was informed Pfeiffer started the fire by using a battery, taken from one of the nearby shelves, placing a metal hook across the terminals, and then placing pieces of cardboard on top of it to serve as a fuel source. Deputy Veletean explained that he performed a test to determine if this method was a possible way to start a fire. Specifically, he stated that he took one of the batteries located on a nearby shelf and placed a similar metal hook onto the terminals. Deputy Veletean testified that he had to abort the experiment after the battery became so hot that it started "to decompose and break down and started to leak acid * * *." *Id.* at p. 182. He added that he was unable to touch the metal hook soon after placing it on the battery because it was too hot.

{¶14} He stated that a sustainable fire requires a few things: an oxygen source, a fuel source, and a heat/ignition source. Here, there was plenty of oxygen circulating in the store. Further, he testified that the cardboard, clothes, and everything else on the display served as fuel sources. Finally, Deputy Veletean explained that the battery would have created the heat source for the fire.

{¶15} On cross-examination, Deputy Veletean admitted that his report failed to include any information regarding the nearby hazards, including the aerosol cans and black powder. However, he explained that his report was limited to the issue of the origin and cause of the fire.

{¶16} On re-direct-examination, Deputy Veletean testified that the majority of deaths from fires result from smoke rather than the flames. Specifically, he noted the dangers of carbon monoxide poisoning and smoke inhalation as being among the leading causes of death from fires. He also added that upon his arrival, which was approximately 20 minutes after the fire had taken place, white, heavy, cold smoke was still prevalent throughout the entire store.

{¶17} On re-cross-examination, Deputy Veletean admitted that no one was injured as a result of the fire.

{¶18} Michelle Stucky was the next witness to testify on behalf of the State. Stucky testified that she was employed by Walmart and worked as an overnight stocker at the Tiffin location. She stated that she was working on September 5, 2014. Stucky added that although she worked with Pfeiffer, she did not know him that well because he had only been working there for a few months.

{¶19} Stucky testified that she ran into Pfeiffer at approximately 3:30 a.m., which was about an hour before the fire started. She stated that he seemed upset. She added that she witnessed Dustin, one of the night managers, talk to Pfeiffer about Pfeiffer's recent poor performance on his assigned tasks. She testified that she asked Pfeiffer if he was okay and he responded that he was upset. Stucky explained that overnight stockers are given certain times in which they are expected to stock the shelves depending on the department. According to Stucky, it appeared that Pfeiffer was not meeting his times that night. She added that

Dustin did not yell at Pfeiffer and, in her mind, Dustin did not treat Pfeiffer any different than any other employee. Stucky stated that Pfeiffer appeared to be quiet and distant afterwards, which contrasted with her previous observations of him.

{¶20} Stucky testified that she observed the fire before evacuating the building. Specifically, she stated that the flames were almost up to the ceiling at one point. She added that the sprinkler system had yet to activate before she left the store. Stucky explained that everyone had to exit out of the doors located near the grocery items at the front of the store, which was on the opposite side of the store where the fire was.

{¶21} When asked why she thought they needed to evacuate the store, Stucky testified, "Because I knew where the fire was and I knew that it was where the propane was and the flames were up to the ceiling, so I knew we had to get everybody out of there. There was also ammo over there. I knew it was very important to get everybody out of there." *Id.* at p. 219.

{¶22} Amy Flores was the next witness to testify. Flores testified that she worked at the Tiffin Walmart as an overnight assistant manager. Flores added that she regularly supervised Pfeiffer on nights that she worked. She stated that he had begun to struggle with keeping up with his times. Flores explained that she had already issued a warning to Pfeiffer regarding his performance in the past. At the time, she told Pfeiffer that he could receive a "coaching" if he did not improve. *Id.* at p. 226. Flores testified that a "coaching" is "a form of discipline that

Walmart has. It's a way of holding people accountable." *Id.* at p. 227. Flores added that Pfeiffer would do other impermissible things such as leaving his assigned area or text people while on the clock.

{¶23} Flores testified that after the fire occurred she went back and reviewed the surveillance videos. She stated that she inadvertently discovered a tape from the previous night, September 4, 2014, which showed Pfeiffer picking up a battery and handling it for a while before suddenly jerking his hand backward after it appeared he was shocked by it. The video was played for the jury and was later admitted into evidence. She explained that she found this odd and forwarded it to store security to give to the police.

{¶24} Paul Crawford was the next witness to testify on behalf of the State. Crawford testified that he was employed by Walmart as the asset protection manager. He stated that his responsibilities included everything that encompasses protecting the company's assets. He added that he was working on September 5, 2014.

{¶25} Crawford explained that the Tiffin Walmart has approximately 150 security cameras located throughout the store. He stated that the fire was not directly caught on camera. Rather, the closest camera was focused on the gun cabinet in the sporting goods section. Crawford identified several video clips, which were later admitted into evidence. Crawford explained that each camera

has a motion device that, when triggered, will place a time stamp on the video. Thus, one is able to see when there is movement within a particular frame.

**{¶26}** Detective Lieutenant Mark Marquis of the Tiffin Police Department was the final witness to testify. Lieutenant Marquis testified that he was on call on September 5, 2014 and responded to a call, at approximately 5:20 a.m., about a fire at Walmart. Upon arrival, he stated that smoke was still lingering in the building. Further, he estimated that the ceilings were approximately 25 to 30 feet high.

**{¶27}** Lieutenant Marquis testified that he reviewed the surveillance footage to determine if any suspects were caught on camera. He was able to determine that the fire occurred approximately at 4:33 a.m. He stated that only a few people were in the vicinity of the sporting goods department before the fire broke out. He explained that he was able to eliminate every person as a suspect except for one, an employee later identified as Pfeiffer. According to Lieutenant Marquis, Pfeiffer was spotted by the cameras in the vicinity of the fire at 4:16, 4:20, and 4:25 a.m. The cameras were able to catch the rest of Pfeiffer's actions, which included a time where it appeared he looked back at the display where the fire eventually took place a few minutes after he left the area and only a couple minutes before the fire started. As a result, Lieutenant Marquis explained that he wished to interview Pfeiffer at the police station.

{¶28} Lieutenant Marquis testified that Pfeiffer consented to an interview and that one took place at the police station. The entirety of the interview was recorded. The recording, labeled State's Exhibit 19, was played for the jury and was admitted into evidence. The following represents the relevant portions of the recording.

{¶29} Pfeiffer stated that he recently moved into an apartment with a roommate. Up until September 5, 2014, Pfeiffer had only been working at Walmart for a couple months. He explained that he enjoyed his job, which required him to stock shelves. Further, he told Lieutenant Marquis that he enjoyed working in the grocery department versus the general merchandise department, which included sporting goods.

{¶30} When asked if he started the fire, Pfeiffer initially denied any involvement. Lieutenant Marquis explained to Pfeiffer that parts of his statements about what happened that night lined up and others did not. During their discussion, Lieutenant Marquis said, "Walmart didn't blow up here. Flames, to a lot of people, look a lot worse than they really are." (State's Ex. 19); Mar. 13, 2015 Trial Tr., p. 41. When asked why he lit the fire, Pfeiffer responded, "Well, if I did, if it was an accident." *Id.* at p. 44. When pressed harder, Pfeiffer said, "I'm sorry that it happened, but I didn't start it on purpose, at least." *Id.* at p. 45. At one point, Lieutenant Marquis asked Pfeiffer, "You're not saying that you didn't

do it?", and Pfeiffer replied, "Right. But the thing is, I'm not saying how I did it." *Id.* at p. 50.

**{¶31}** Pfeiffer indicated that he would be willing to take a lie detector test to prove his innocence. When Lieutenant Marquis asked him what the machine would say if Pfeiffer was asked whether he started the fire, Pfeiffer said, "That if I said no, it wouldn't be truthful." *Id.* at p. 55. He quickly clarified that he meant it would say he was telling the truth. At this point in the interview, Lieutenant Marquis left the room so that Pfeiffer could write a personal statement describing his knowledge of the events. In this statement, Pfeiffer denied starting the fire.

**{¶32}** Pfeiffer admitted that he had experience with batteries. Specifically, he stated that he used batteries on automotive and computer projects in the past. He stated that he was familiar with electricity and took a class on cabling in college. Pfeiffer stated that if someone were to cross the wires on a large battery, then sparks would occur. He then recalled that this happened the night of the fire when the battery he had picked up touched a metal hook, which caused sparks to occur. However, he initially stated this only occurred one time and then it did not happen again. He also admitted that he has seen videos posted on the internet where people use steel wool and a battery to make a fire.

**{¶33}** Pfeiffer began to break down and discussed how he had been struggling at Walmart with meeting his quotas. He stated that he felt upset that he

seemed to be the only one that could not keep up with the rest of the employees. Then the following exchange occurred.

Q:     Yeah. Tell us what you did.

A:     I took the battery. I honestly didn't think that anything would happen. I put it on the shelf and I had laid something on top of it. I can't - -

Q:     Do you know what you laid on top?

A:     It was a hook or something.

Q:     Okay. The hook, you knew the hook was going to cause an arc.

A:     Oh, no, of course not.

*Id.* at p. 80. Pfeiffer added that he made sure that the hook and the battery terminals were apart from each other. He explained that the battery started to spark and he claimed that he nudged the hook with a piece of cardboard so he would not get shocked by the battery. Then the following exchange occurred.

Q:     So it was making reactions when you put it on there.

A:     Yes.

Q:     You knew it was. And you knew what - - you knew exactly what happens with sparks, that they cause fires.

A:     I knew how to stop it. I guess I didn't.

*Id.* at p. 83. When asked if he knew what was going to happen when the hook touched the terminals, Pfeiffer responded, "I know." *Id.* at p. 86. Later, Pfeiffer

-13-

agreed with Lieutenant Marquis that deep down Pfeiffer knew that something bad was going to happen when he put the hook and cardboard on top of the battery.

**{¶34}** At this point in the interview, Pfeiffer stated that his first statement was a lie. Afterwards, Pfeiffer agreed to write another statement, in the form of an apology letter, where he confessed to starting the fire ("confession note"). The confession note, in its entirety, read:

> I'm so sorry. I'm so frustrated. I can't control my emotions, and at times I feel like I'm not myself. I try so hard at work, only to have those over me tell me how I need to do better. I try to explain that it's just because I am new, but the whole time I can read their thoughts. 'He's worthless and lazy.' I hear. Even though my head says 'It's your first full time job, you'll learn.' While my heart feels crushed at the criticism. I put the battery on the shelf, I put the hook on top of it, **I** started the fire. I honestly was just hoping for some smoke, but by the time I heard of the fire, it was too late. I didn't think I'd get this kind of attention, just the 'I'm so glad you're alright!' kind.
>
> Michelle, I'm sorry you worried so much about me. I always saw you as someone I could be close friends with, you always seem to be interested in what I was doing.
>
> And Dustin, I'm dreadfully sorry for what I did. I'm not mad at you, just frustrated with life as a whole. I'm just glad no one was hurt.
>
> I'm so so sorry. I wish I could take it back.

(Emphasis sic.) (State's Ex. 20). A copy of the confession note was later admitted into evidence. The recording concluded after Pfeiffer swore that the confession note was the truth under penalty of perjury.

{¶35} After finishing the interview with Pfeiffer, Lieutenant Marquis testified that he returned to Walmart with Deputy Veletean to look for any evidence of the battery or hook involved in the fire. He admitted that they were unable to find any remnants at the scene, but explained that it was possible that the fire consumed all of the materials. He identified several photographs he took of the scene, which were later admitted into evidence. Included in the photographs were photographs of the suspected type of battery and hook used by Pfeiffer to start the fire.

{¶36} On cross-examination, Lieutenant Marquis admitted that Pfeiffer never told him that Pfeiffer wanted or intended to start a fire.

{¶37} On re-direct-examination, Lieutenant Marquis testified that Pfeiffer admitted that he knew that placing a metal hook on top of the battery would cause sparks.

{¶38} At the conclusion of Lieutenant Marquis's testimony, the State rested. At that time, Pfeiffer's counsel moved for acquittal pursuant to Crim.R. 29, which was denied by the trial court. Pfeiffer's counsel then rested and renewed his Crim.R. 29 motion, which was again denied.

{¶39} The jury ultimately returned guilty verdicts on both counts on March 16, 2015. A sentencing hearing was held on May 20, 2015. At the hearing, Pfeiffer made an oral motion to merge the convictions for purposes of sentencing. The State did not oppose the motion, but argued that the sentences be served

concurrently, and the trial court granted Pfeiffer's motion. The trial court ultimately sentenced Pfeiffer to three years in prison on the first count and two years in prison, to be served concurrently, on the second count.

{¶40} Pfeiffer filed this timely appeal, presenting the following assignments of error for our review.

### Assignment of Error No. I

**THE JURY'S VERDICTS ON BOTH COUNTS ONE AND TWO ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED.**

### Assignment of Error No. II

**THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION FOR ACQUITTAL PURSUANT TO CRIM. RULE 29.**

{¶41} Due to the nature of Pfeiffer's assignments of error, we elect to address them out of order.

### Assignment of Error No. II

{¶42} In his second assignment of error, Pfeiffer argues that the trial court erred by entering a verdict that was not supported by sufficient evidence. Specifically, in regard to count one, Pfeiffer argues that the State did not present evidence proving Pfeiffer acted knowingly or that he created a substantial risk of harm. In regard to count two, Pfeiffer argues that the State did not present evidence proving that he acted knowingly. We disagree.

*Standard of Review*

{¶43} When an appellate court reviews the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

*Count One*

{¶44} If a person knowingly creates a substantial risk of serious physical harm to any person other than himself, by means of fire or explosion, then he is guilty of aggravated arson. R.C. 2909.02(A)(1). A "person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). A "substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "The Ohio Jury

Instructions emphasize the distinction between a 'strong possibility,' 'remote possibility,' and 'significant possibility' by suggesting the option of adding the words 'even a' in front of the phrase 'significant possibility.' " *State v. Wolf*, 176 Ohio App. 3d 165, 2008-Ohio-1483, ¶ 24 (3d Dist.), citing 4 Ohio Jury Instructions (2003), Section 509.02(3).[1] " '[T]he language chosen by the General Assembly contemplates three degrees of 'possibility': the highest is 'strong,' the middle is 'significant,' and the lowest is 'remote.' For this reason, the Committee added '(even a)' to the statutory definition.' " *State v. Eggeman*, 3d Dist. Van Wert No. 15-04-07, 2004-Ohio-6495, ¶ 40 (Rogers, J., concurring in part and dissenting in part), quoting 4 Ohio Jury Instructions (2003), Section 509.02(3), at comment. "Accordingly, the statutory definition of substantial risk recommended by the Ohio Jury Instructions reads: ' "a strong possibility as contrasted with a remote or even a significant possibility, that a certain result may occur or that certain circumstances may exist." ' " *Wolf* at ¶ 24, quoting *Eggeman* at ¶ 40 (Rogers, J., concurring in part and dissenting in part), quoting 4 Ohio Jury Instructions (2003), Section 509.02(3), at comment.

{¶45} "Serious physical harm to persons" is defined as:

(a)     Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

---

[1] We note that this citation for the aggravated arson instruction is no longer current. Rather, see 2 Ohio Jury Instructions (2015) Section 509.02(3), at comment.

(b)     Any physical harm that carries a substantial risk of death;

(c)     Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d)     Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e)     Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

**{¶46}** Finally, in cases involving aggravated arson, we have found that

[t]he 'knowingly' element in an aggravated arson case refers to a defendant's state of mind when he set a fire – i.e. the defendant is aware that the fire or explosion he set will probably create a substantial risk of serious physical harm.  The requisite proof is not dependant [sic] upon the actual result of the fire but is based upon the risk of harm created by the defendant's actions.

*Eggeman* at ¶ 14.

**{¶47}** Pfeiffer has limited his appeal to the issues of whether the State presented sufficient evidence as to the knowingly and substantial risk of harm to persons elements.  He has not challenged the other elements of aggravated arson. Thus, we limit our discussion to the consideration of these two elements.

**{¶48}** At trial, the State presented the video recording of Pfeiffer's interview as well as Pfeiffer's confession note.  The jury was able to hear Pfeiffer's own words in the interview where he admitted that he knew about how a

battery and metal, specifically steel wool, could be used to create sparks. Further, he could be heard stating that he had worked with similar types of batteries before. He said that he *knew* what would happen if and when he placed the hook on top of the battery and admitted that it would not be a good result. The jury was also able to read Pfeiffer's confession note where he stated "I put the battery on the shelf, I put the hook on top of it, **I** started the fire. I honestly was just hoping for some smoke, but by the time I heard of the fire, it was too late." (Emphasis sic.) (State's Ex. 20).

{¶49} In addition to Pfeiffer's own words, the jury also heard testimony from several individuals involved in the case and were able to watch surveillance footage of both the day before and the day of the fire. Several of the witnesses testified that they reviewed the surveillance videos of September 4, 2014, the day before the fire, and could see Pfeiffer handling a battery and described that it appeared Pfeiffer was shocked by the battery. The members of the jury were also able to see this video for themselves.

{¶50} The jury heard the testimonies of Lieutenant Marquis and Deputy Veletean, both of whom testified about the dangers this fire posed. Deputy Veletean testified that while flames can be dangerous and cause burns to people, the smoke resulting from a fire is the most dangerous to people. He stated that smoke is the leading cause of deaths in fires due to carbon monoxide poisoning and smoke inhalation. Nearly all the witnesses testified that smoke was clearly

prevalent in the store from the time the fire began until long after the fire was extinguished. Further, Deputy Veletean testified that the smoke would pose a threat to anyone in the store, even those on the opposite side from the fire. Both Deputy Veletean and Lieutenant Marquis testified about the dangers the surrounding objects in the proximity of the fire caused. Both stated that black powder, propane tanks, aerosol cans, and ammunition were within five feet of the fire. Deputy Veletean explained how these materials were extremely flammable and could cause explosions or how they could be turned into projectiles that could cause serious injury to anyone with whom they came into contact. Stucky testified that the fire was so great that she knew she had to get all the customers and workers out of the store and to safety.

{¶51} Upon review of the record, we find that any rational trier of fact could have found that Pfeiffer committed aggravated arson. Testimony was presented, including Pfeiffer's own statements, that Pfeiffer knew that a fire was going to result from his actions and that this fire would pose a significant risk of harm to everyone in the building. Pfeiffer argues that the State could not prove the element of knowingly because he did not set the fire on purpose. However, purposely is not the same state of mind as knowingly. The two are separate and distinct from one another. *Compare* R.C. 2901.22(A) *with* R.C. 2901.22(B). Significantly, the definition of knowingly includes the phrase "regardless of purpose." Thus, by definition, the State was not required to present any evidence

that Pfeiffer's purpose was to cause serious physical harm to anyone. After viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of aggravated arson beyond a reasonable doubt.

*Count Two*

{¶52} If a person knowingly causes physical harm to any occupied structure by way of fire or explosion, then he is guilty of aggravated arson. R.C. 2909.02(A)(2). A "person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). An "occupied structure" is defined as "any house, building, outbuilding, * * * or other structure, * * * or shelter, or any portion thereof, to which any of the following applies: * * * [a]t the time, any person is present or likely to be present in it." R.C. 2909.01(C)(4).

{¶53} As to Count Two, Pfeiffer argues that the State failed to present evidence to establish the knowingly element of the offense. He does not challenge the other elements. Thus, our analysis will focus only on the element of knowingly .

{¶54} Upon review of the record, we find that any rational trier of fact could have found that Pfeiffer committed aggravated arson. As we discussed in more detail supra, we found that the State presented sufficient evidence that

Pfeiffer knowingly started a fire. Moreover, testimony was presented that Pfeiffer placed the battery on a display that had several different items of merchandise on it. Pfeiffer also admitted that Walmart was occupied at the time he started the fire. Again, Pfeiffer argues that the State failed to present any evidence that he purposely started the fire. As noted supra, however, the State was not required to prove that he started the fire on purpose. Rather, the State was required to present evidence that Pfeiffer knowingly created the fire. After viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of aggravated arson beyond a reasonable doubt.

{¶55} Accordingly, we overrule Pfeiffer's second assignment of error.

*Assignment of Error No. I*

{¶56} In his first assignment of error, Pfeiffer argues that the jury's verdicts were against the manifest weight of the evidence. We disagree.

{¶57} When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *Thompkins*, 78 Ohio St.3d at 387. Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st

Dist.1983). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id*. at paragraph three of the syllabus.

{¶58} Having disposed of Pfeiffer's sufficiency arguments, we similarly reject his manifest weight arguments.[2] Pfeiffer makes the same arguments in regard to manifest weight that he made regarding his sufficiency claim. As we discussed in more detail supra, the jury was presented with testimonies of those involved in the case as well as other exhibits, including the recording of the interview and Pfeiffer's confession note. "On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶59} Evidence was presented that Pfeiffer knew a fire could be started using a battery and a piece of metal. Further, evidence was presented showing that Pfeiffer did, in fact, start the fire. Testimony was heard regarding the severe dangers posed by the fire in this case. Finally, several witnesses stated that Walmart suffered physical damage to its property. After a thorough review of the record, we cannot say that this is the exceptional case where the trier of fact lost its

---

[2] For ease of discussion, although we separately addressed both convictions regarding sufficiency, we elect to discuss both convictions together regarding manifest weight.

way and committed a miscarriage of justice by finding Pfeiffer guilty of two counts of aggravated arson.

{¶60} Accordingly, we overrule Pfeiffer's first assignment of error.

{¶61} Although we affirm Pfeiffer's convictions, we must nonetheless reverse the judgment of the trial court sentencing Pfeiffer to three years in prison, and remand for the purposes of resentencing due to the court's failure to follow the proper procedure regarding merger.

{¶62} The Supreme Court of Ohio has recognized that the "imposition of multiple sentences for allied offenses of similar import is plain error." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 31, citing *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, ¶ 96-102. "When a defendant has been found guilty of offenses that are allied offenses, R.C. 2941.25 prohibits the imposition of multiple sentences." *State v. Damron*, 129 Ohio St.3d 86, 2011-Ohio-2268, ¶ 17, citing *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶ 12; R.C. 2941.25(A). "When the defendant has been found guilty of two or more allied offenses the state must select which offense it will pursue." *State v. Jones*, 3d Dist. Allen No. 1-11-60, 2012-Ohio-2694, ¶ 8, citing *State v. Harris*, 122 Ohio St.3d 373, 2009-Ohio-3323, ¶ 21, citing *City of Maumee v. Geiger*, 45 Ohio St.2d 238, 244 (1976). "Thereafter, the trial court must merge the allied offenses into a single conviction and impose a sentence that is appropriate for the offense selected by the state for

sentencing." *Jones* at ¶ 8, citing *Damron* at ¶ 17, citing *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 41-43.

**{¶63}** Here, the trial court stated its intention to merge both offenses at Pfeiffer's sentencing hearing. May 20, 2015 Hrg., p. 33; (Docket No. 42, p. 3).[3] Further, it is clear from the record that the State failed to elect on which count it wanted to proceed to sentencing. The trial court seemingly attempted to correct this mistake by ordering that the sentence on count two be served concurrent to the sentence on count one. In Ohio, it is well established that ordering concurrent sentences for allied offenses fails to satisfy the merger doctrine because the trial court lacked the authority to enter a sentence on any count other than the one elected by the State. *Damron* at ¶ 17. Accordingly, we must remand this matter to the trial court for a new sentencing hearing. *Whitfield* at ¶ 25.

**{¶64}** In a remand based solely on an allied-offenses sentencing error, which is the case here, the guilty verdicts underlying a defendant's sentences remain the law of the case and are not subject to review. *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, ¶ 15, citing *Whitfield* at ¶ 26-27. Accordingly, upon remand, the State must select which offense it wants to pursue for sentencing, either the first or second degree felony for aggravated arson. Pursuant to *Whitfield*, the trial court must accept the State's selection, merge the offenses

---

[3] The issue of whether merger was appropriate under the facts of this case has not been raised and we pass no judgment on it. However, because the issue was not contested, merger remains as the law of the case.

accordingly for the purposes of sentencing, and impose a sentence that is appropriate for the offense selected by the State. *Jones* at ¶ 10, citing *Wilson* at ¶ 18.

{¶65} Having found no error prejudicial to Pfeiffer, in the particulars assigned and argued, but having found error in the court's imposing of Pfeiffer's sentence, we affirm in part, reverse in part, and remand the matter for further proceedings consistent with this opinion.

***Judgment Affirmed in Part, Reversed in Part, and Remanded***

**SHAW and PRESTON, J.J., concur.**

**/hlo**